**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **L.D. B/N/F** | § | |
| **CHERYL BROWN** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **C.A.** 4:16-CV-134 |
| | § | |
| **HUMBLE INDEPENDENT** | § | |
| **SCHOOL DISTRICT,** | § | |
| **Defendant.** | § | |

**ORIGINAL COMPLAINT**

**NOW COMES** L.D.[1], by his next friend and mother, Cheryl Brown, (collectively hereinafter referred to as "Plaintiffs") and brings this, their *Original Complaint* alleging that the Humble Independent School District (hereinafter referred to as "Humble ISD" or the "School District"), violated the various rights of L.D. as more specifically pled herein. Plaintiffs reserve the right to re-plead if new claims and issues arise upon further development of the facts, as permitted by law. In support thereof, Plaintiffs would respectfully show the following:

## I. PROLOGUE

1. There is not a week, often even a day, that goes by where there is not some media story about the plight of a young person (especially those perceived as different because of nationality, race or religion, disability, or gender stereotypes) who is bullied, harassed or assaulted at their school. Frankly, it is a national epidemic. Unlike the task of containing the spread of a flu virus by means of vaccines and treatment, this type of epidemic is particularly difficult to treat because often the school district itself, as in L.D.'s situation, is part of the illness and

[1] Initials are used to protect the confidentiality of the minor student and others similarly situated.

refuses to recognize its responsibility.

2. The District's failure in this case is troublesome, as they were on notice in the past about this general problem over the course of many years. It is even more pronounced in the light of the fact they were on notice about L.D.'s experience and failed to correctly address it. Moreover, their failure is particularly egregious in that, in the era of racial sensitivity, his cries for help were left without an appropriate response.

3. As we now know, some of the children who are victimized by bullies become violent in their own effort to lash out against their tormentors. The vast majority of students who are bullied at school suffer in silence, attending school each day with the simple hope and prayer that they simply will be left alone. It is well-known across the professional education community that those who are not left alone and continue to be victims of bullying and harassment, often turn their rage inward, especially where their cries for help are not heard. They become angry, and then depressed, just like what occurred with L.D.

4. For the families there is nothing more sad then seeing your child suffer. To give meaning to their child's experience , they feel compelled to tell their story. They feel a duty to do so in the hope the presentation of their story will prevent the same from happening to another family. In the course of this telling, these victims benefit from a healing effect. The healing and empowering effect is even more pronounced when the story is told before a Federal Judge and in Federal Court, where the bright light and sanitizing effect of federal law and the Judge's gaze is focused on this important issue and the School District's failures.

## II. BRIEF INTRODUCTION TO THE CASE

5. L.D. is a student of African-American descent. While a student in the District, he was bullied

and harassed on almost a daily basis.

6. But it was not only verbal harassment. L.D. was a victim of physical bullying and assaults to his person as well. He was tripped, bumped into, and pushed in the hallways or students would throw food at him during lunch.

7. L.D.'s mother frequently complained to the District. L.D. frequently complained to the District. Nevertheless, school officials failed to fully address their concerns as required by law.

8. L.D.'s mother brings forth this lawsuit with one major goal: that the verbal and physical harassment her son experienced, need not occur to any other child or their family. To that end, she simply asks the Defendant School District satisfy the standards of care set forth by the Department of Education regarding both the investigating allegations of bullying and harassment and the way to remedy such bullying and harassment.

9. In addition, she asks that his injuries be addressed and remedied, due to the acts and omissions of the District, and the discrimination L.D. experienced. Such discrimination was based upon his race. Accordingly, Plaintiffs brings forth this lawsuit pursuant to Title VI of the Civil Rights Act of 1964; 42 U.S.C. §2000d, et seq., and Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. 1981 and both to be litigated through 42 U.S.C. §1983

## III. JURISDICTION

10. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §1331 and 1343 because the matters in controversy arise under the laws and rules of the United States as noted above.

## IV. VENUE

11. Under 28 U.S.C. § 1391, venue is proper before this Court because the events and omissions

giving rise to the Plaintiff's claims occurred in the Southern District of Texas and in the Houston Division.

## V. CONDITIONS PRECEDENT

12. Plaintiffs have exhausted their special education related claims pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1415(1) and 19 T.A.C. §89.115(p) and as such all conditions precedent to the filing of this lawsuit have been fulfilled.

## VI. PARTIES

13. L.D. previously lived in Kingwood in the Humble Independent School District catchment area, with his mother, Cheryl Brown. They currently live in Denton, Texas. At all pertinent times relevant to this lawsuit, L.D. was a pupil in the Humble Independent School District. It is uncontroverted that L.D. is of African-American descent. Ms. Brown brings forward this Complaint as L.D.'s parent, natural guardian and next friend.

14. The Humble Independent School District is a school district organized under the laws of the State of Texas and at all times is required to follow the policies and procedures as set forth by the School Board. District personnel are thus responsible for the care, management and control of all public school business within its jurisdiction as to Plaintiff L.D., the training of teachers at the School as to safety, supervision of students within the district and for the course of study. They may be served by and through their Superintendent, Dr. Guy M. Sconzo, at 20200 east Village Drive, Post Office Box, 2000, Humble, Texas 77347-2000. Petitioners reasonably believe they will be represented by and through their Counsel, the Honorable Ms. Janet Horton, with the Law Firm of Thompson, Horton, L.L.P, Phoenix Tower, 3200 Southwest Freeway, Suite 2000, Houston, Texas 77027.

## VII. STATEMENT OF FACTS

### A. About L.D.

15. L.D. is now seventeen (17) years old, having been born on January 7, 1999.

16. Despite the fact that his family has moved several times, L.D. has always been an honors student, earning A's and B's in his coursework.

17. From August through October 2013, L.D. attended school at JW North High School in Riverside, California, where he was the captain and starting quarterback of the football team. While on the team, L.D. repeatedly experienced racist harassment and bullying from the coaches and was repeatedly called a "nigger." In part, to provide L.D. with refuge from this hostile environment, Ms. Brown moved her family to Texas.

18. L.D. enrolled in Kingwood High School at the beginning of November 2013. In one early conversation with the Athletic Director, Ms. Brown discussed her son's experiences of harassment from his prior coaches and her hopes of L.D. getting a fresh start at Kingwood.

### B. Reports of Bullying and Harassment

19. However, L.D. started experiencing harassment almost immediately upon enrollment. In the hallways, students went out of their way to let him know that Kingwood High School was 95% white.

20. Several times, when he told students that he was from California, they would respond "what part, Compton?"

21. During his first few months at Kingwood, L.D. was subjected to regular harassment from other students passing him in the hallway with comments including, "look at the new black kid," "oh, guys look we got a new black kid here," "look at that stupid kid," and even "there

goes that new nigger." At no point did teachers or school administrators intervene.

22. In early November, while L.D. was having lunch in the cafeteria, he struck by a package of carrots that another student had thrown at him.

23. Concerned about the harassment her son was experiencing, Ms. Brown was in constant communication with Kingwood's Assistant Principal, Liz Rogers, via email, phone, and in person visits to the school office.

24. When she attempted to meet with Ted Landry, the principal of the school, she was rebuffed by the secretaries and consistently directed to Ms. Rogers to raise her concerns.

25. L.D. continued to experience harassment because of his race. Over Thanksgiving break, L.D. attended a basketball tournament with his team at Kingwood Park High School.

26. While his teammates were catching up with their friends from Kingwood Park High School, one of the Kingwood Park students motioned to L.D. and asked who he was. One of L.D.'s teammates from Kingwood high school responded "that's L.D., everything about him is black, the way he talks, the way he walks, his hair, the way he dresses, he even wears black," which sent the group of students surrounding him into a frenzy of laughter.

27. L.D. also experienced a hostile environment in the classroom. In his Geography classroom, he was ignored when he greeted the teacher upon arrival.

28. In December, one lesson the teacher instructed the classroom that minority children raised by single mothers were "screwed." L.D. felt targeted since he fit that profile.

29. This same teacher often used the example of Humble High School, a school with a much higher minority population, in contrast with Kingwood High School. He would say that Kingwood has the "Rich white kids", in contrast he would talk about Humble high and talk

about how "unfortunate" they are, as well as talk about how that may be attributed to the fact that there are more minorities at Humble.

30. Also in this class, while presenting projects in class, two white girls were speaking of homelessness and one of the students said, "As you can see there are not many white people on the street. He asked them why do they think that is, and one of the students responded, "Because white people are better educated and apply themselves more than minorities do."

31. In a different class in December, L.D.'s classmates decided that L.D. would best fit the role of a servant during a class play of Romeo and Juliet.

32. Several times in his Biology class, L.D. would raise his hand and his teacher, Mrs. Bridges, would simply stare at him or ignore him. L.D. felt dehumanized by those experiences.

33. L.D. continued to experience harassment and bullying from his basketball teammates. On several occasions in the cafeteria, his basketball teammates would collectively get up and leave the table as a team once L.D. sat down.

34. In the locker room, his teammates made jokes playing into racial stereotypes at his expense. One day upon entering the locker room early in the morning with a bag in his hand, one of his teammates asked "what do you have in the bag L.D., KFC?" All of the students except for L.D. laughed at this comment.

35. L.D. became fearful for his bodily autonomy. In addition to being regularly pushed and shoved in the hallway, in one instance in December, L.D. watched other students, including several basketball teammates playing a game in which they would grab and pinch one another's nipples and he was afraid the students would subject him to this abuse.

36. In December, Kingwood High School played a game against rival Atascocita High School,

which has a much higher minority population than Kingwood. After which, a fight was started by a Kingwood Student who was upset about the team's loss. The fight became so intense that the police had to intervene to break-up the fight. The next day, Kingwood's principal, Mr. Landry, came over the public announcement system and blamed Atascocita for the fight, and then said that he was proud that they did not respond the "Atascocita way."

37. During this time, L.D.'s mother was in regular phone, email, and in person contact with Assistant Principal Rogers trying to resolve the harassment and bullying her son was experiencing.

38. On December 20, Ms. Brown had a meeting with Ms. Rogers in which she was told "kids are going to be kids" and was urged to give L.D. more time to adjust.

39. In this conversation, Ms. Rogers informed L.D.'s mother that she had plenty of black friends and that she sends texts reading "what's up my nigga" to a former student, assuring Ms. Brown that it was okay to use the slur, "as long as you don't put an 'ER' on the end of it." Ms. Brown was never given any information regarding how to file a formal complaint.

40. In January of 2014, L.D. continued to experience a hostile environment in which racist jokes were the norm. In his Spanish class, one student asked him "Why are there no black superheroes" and was told "it's because they all went to the NBA," before another student chimed in and said, "Oh, I thought you were going to say it's because they all went to jail." The class erupted in laughter.

41. In another instance, L.D. witnessed a joke at the expense of a minority when a student told a teacher, Mr. Garcia, who is Hispanic" that he should be cutting his grass. Mr. Garcia responded by asking the student "Do I need to write you up for racism?"

42. In Spanish class, L.D. witnessed another black student being bullied with the comment, "your parents must have named you wrong because you're so black." This student did not participate in a sport, and the students would joke "you're black and you don't play a sport?"

43. In the cafeteria, students would make jokes about Obama and then immediately apologize to L.D. afterwards.

44. At a January basketball game at Kingwood High School versus rival Atascocita High School, a school with a much higher minority population, L.D. and Ms. Brown witnessed Kingwood students attempting to intimidate Atascocita by wearing a white hood with eye-holes cut out, reminiscent of a KKK hood.

45. In mid-February, L.D. experienced his first panic attack as a result of the consistent harassment and bullying that he experienced at Kingwood High School. His mother spoke with Assistant Principal Rogers about this incident, as well as about L.D.'s deteriorating academic performance. Due to persistent bullying in the cafeteria, L.D. was avoiding the cafeteria, instead eating his lunch in the hallway or the locker room. At this point, Ms. Brown informed Ms. Rogers that she was considering applications to private school for L.D. due to the continued harassment he was experiencing. Several teachers at Kingswood wrote recommendations for L.D.'s applications.

46. At the end of February, L.D. was approached by a white student and asked if he would sell this student drugs.

47. In March during the week leading to Spring Break, L.D. was in the football locker room when a few students walked by him and called his name. When L.D. looked over, one of the students pulled his pants down, "mooning" L.D. as he slapped himself on the butt, while the

other students stood there laughing.

48. The situation continued to deteriorate for L.D. One day in his Geography class, his phone accidentally went off. The teacher asked the class whose phone it was and another student immediately said "blame it on the black boy." When the teacher asked to respond, L.D., normally quiet and mild mannered in school replied, "never mind, I don't feel like getting pissed off right now."

49. Later in the day after the above incident, the same student who said "blame it on the black boy" started harassing an Indian student by saying that his grandfather's name was Gupta, once again in front of the class, where everyone could hear, and yet again the teacher sat there and did absolutely nothing except laugh at this derogatory joke. The Indian student repeatedly denied the statement, but the student kept insisting that his grandfather's name was Gupta.

50. After Spring Break, L.D. refused to continue attending school at Kingwood.

51. Ms. Brown made an appointment to meet with Assistant Superintendent Kramer on March 17th. At this time, the things at Kingwood had gotten so bad, Ms. Brown was considering withdrawing her son to home-school him. During the meeting, instead of taking steps to help correct the situation at Kingwood High School, Ms. Brown was encouraged to transfer her son to Atascocita High School, a campus with a much higher minority population. Superintendent Kramer assured Ms. Brown that L.D. would "fit in well there."

52. Since L.D. never returned to Kingwood High School after Spring Break, on March 24, Ms. Brown went to retrieve some clothing that had been left in L.D.'s basketball locker. In the bag that was given to Ms. Brown, there was a pair of underwear that did not belong to L.D.

Despite being secured L.D.'s locker since February, the clothing that was returned to Ms. Brown was wet and reeked of urine and feces. Ms. Brown made a report with campus police.

**C. The Effects of Bullying and Harassment on L.D.**

53. After his experiences at Kingwood High School, L.D. required extensive counseling and continues to experience depression, anxiety, and anger.

**D. Conclusion**

54. At any given time during L.D.'s time at the District, the District was deliberately indifferent to the needs of L.D.

55. The reports, altercations, grades, etc. were all clear signs that the school had a duty to assist and aid L.D.

56. The allegations of bullying and harassment were neither properly reported by school staff/personnel, nor investigated.

57. The school failed to implement appropriate safety measures to prevent future bullying and otherwise provide a safe environment for L.D. School administration continued its discriminatory policy of ignoring the bullying altogether. The discrimination based on L.D.'s race stand in direct contrast to L.D.'s constitutional rights and statutory rights.

58. The District failed to address the impact of harassment of L.D. and never provided L.D. services related to bullying or harassment such as professional counseling or a one-on-one aide.

E. About This School District

59. The District has a history of problems in this area. For instance, in December of 2012 a student was accused of defacing several bathrooms at the Kingwood High School with racist

graffiti using a permanent marker, court documents show. The graffiti, school officials said, referred to the white supremacist prison gang the Aryan Brotherhood of Texas as well as sketches of neo-Nazi symbols.

60. In May of 2012 persistent bullying and name-calling at Creekwood Middle School in Kingwood forced the parents of twin boys to temporarily transform their home into a makeshift classroom. The boys are 11 years old and were born in the United States though both of their parents were born in India. One was called a terrorist and punched in the neck. The other said he was told that he looked like Osama bin Laden and was called the underwear bomber. One brother was punched in the eye and also had his eyebrow shaved off. The boys parents have compiled dozens of emails and letters, documenting their history of complaints to the district but nothing was ever done.[2]

## VIII. STATE ACTION

61. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

62. The District, in any capacities and in all matters, acted under color of state law when it permitted Plaintiff to be subjected to the wrongs and injuries set forth herein.

## IX. CLAIMS PURSUANT TO TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

63. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

64. Title VI of the Civil Rights Act of 1964, codified at 42 U.S.C. §2000d et seq, and its implementing regulations require that each state that receives disbursements, including the

---

[2] http://www.khou.com/story/news/2014/07/19/11717386/

state's political subdivisions, not permit a student be a victim of discrimination based upon race.

65. Plaintiffs assert that because the District knew that L.D. was being bullied, harassed and physically assaulted based upon his race, failed to keep him safe from harm and failed to provide him an environment that was not hostile, such failures as noted hereinabove, have together and separately, contributed to violating his civil rights pursuant to Title VI.

## X. CLAIMS PURSUANT TO 42 U.S.C. §1983 AND TO THE 14th AMENDMENT TO THE U.S. CONSTITUTION

66. Petitioners incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

67. L.D. has a right to privacy and to bodily integrity pursuant to the due process clause of the 14th Amendment to the United States Constitution.

68. The District failed to protect such rights.

69. The District failed to provide equal protection under the 14th Amendment to the United States Constitution.

70. The acts and omissions of the District, specifically undermined and interfered with L.D.'s right to privacy and bodily integrity, for which the District is liable to him pursuant to 42 U.S.C. §1983.

## XI. RATIFICATION

71. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

72. The District ratified the acts, omissions and customs of school district personnel and staff.

73. As a result, the District is responsible for the acts and omissions of staff persons who were

otherwise responsible for the safety of L.D.

## XII. PROXIMATE CAUSE

74. Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

75. Each and every, all and singular of the foregoing acts and omissions, on the part of the School District, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XIII. DAMAGES

76. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

77. As a direct and proximate result of the School District's conduct, K.S. has suffered injuries and damages, for which he is entitled to recover herein within the jurisdictional limits of this court, including but not limited to:

    a. Loss of educational opportunities;

    b. Physical pain in the past;

    c. Medical expenses in the past;

    d. Mental anguish in the past;

    e. Mental anguish in the future;

    f. Physical impairment in the past; and

    g. Various out-of-pocket expenses incurred by L.D.'s family but for the acts and omissions of the District.

## XIV. ATTORNEY FEES

78. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

79. It was necessary for Plaintiffs to retain the undersigned attorneys to file this lawsuit. Upon judgment, Plaintiffs are entitled to an award of attorney fees and costs pursuant to Title VII.

## XV. PUNITIVE DAMAGES

80. Plaintiff incorporates by reference all the above-related paragraphs with the same force and effect as if herein set forth.

81. As noted above, this School District has a history of problems regarding discrimination based upon race and nationality.

82. The acts and omissions of the Defendant School District shock the conscience, and thus satisfy criteria for punitive damages, as contemplated by Section 1983.

## XVI. EQUITABLE RELIEF

83. Petitioners respectfully requests that the Court order the School District to:

    a. Adopt an anti-bullying and harassment program that is provided by a third-party, like the Anti-Defamation League or the Southern Poverty Law Center;

    b. Adopt policies, procedures, and practices commensurate with the Dear Colleague Letter, dated October 26, 2010, from the United States Department of Education Office for Civil Rights;

    c. That for the next three years the District provide for a school-safety coordinator for each Campus, so as to assure that the program is enacted comprehensively;

    d. That the District retain a neutral third party to complete a bullying assessment for

each campus and have that person or entity report back to the President of the School Board and Superintendent so the District may address any issues noted in the assessment;

e. That staff receive "Diversity training" by a third party to include information about race, nationality, gender and disability stereotypes;

f. That the school provide a marker in the school library, where books and other materials would be made available to students dealing with bullying harassment, and related emotional concerns and issues related to gender, race, and disability along with common stereotypes that accompany those subjects;

g. That Anti-bullying month be recognized by the District;

h. That the school district help facilitate the provision of counseling services for students deemed to be at risk;

i. That the School Board appoint a committee including interested members of the public to address the issues noted herein, report back to the Board and act accordingly; and

j. For any other relief the Court may see fit to prescribe.

## XVII. DEMAND FOR JURY TRIAL

84. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray for judgment against the District in the manner and particulars noted hereinabove, and in an amount sufficient to fully

compensate them for the elements of damages noted hereinabove, judgment for damages, recovery of attorney's fees and costs for the preparation and trial of this cause of action and for its appeal if required, together with pre- and post- judgment interest and court costs expended herein, as well as the equitable issues noted hereinabove; and for such other relief as the Court, in equity, deems just and proper.

Respectfully submitted,

Cirkiel & Associates, P.C.
1901 E. Palm Valley Boulevard
Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]

/s/ Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq.
Federal ID 21488
State Bar No.: 00783829
marty@cirkielaw.com [Email]

Mr. Daniel Garza, Esq.
State Bar. No. 24081363
dangarza@cirkielaw.com [Email]

**REPRESENTATIVES FOR PETITIONER**